UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AARON GREENSPAN,

       Plaintiff,

   v.

DEPARTMENT OF TRANSPORTATION, et al.,

       Defendants.

Civil Action No. 22-0280 (DLF)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 1

LEGAL STANDARD.................................................................................................... 5

ARGUMENT ............................................................................................................... 6

I.  THE ADEQUACY OF THE SEARCH IS NOT AT ISSUE BECAUSE PLAINTIFF HAS
NARROWED THE FOIA REQUESTS TO THE MATERIALS PREVIOUSLY
PROCESSED........................................................................................................... 6

II. THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 4
WITHHOLDINGS. ................................................................................................. 7

  A.     Plaintiff Misconstrues the Meaning and Effect of the Timing Requirement for Ruling
on Confidentiality Requests. ...................................................................................... 7

  B.     The Materials Withheld Under Exemption 4 Are Confidential Business Information,
and Further Disclosure Thereof Is Reasonably Expected to Cause Foreseeable Harm. ........ 15

III. THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 5
WITHHOLDINGS. ............................................................................................... 30

  A.     The Agency Has Adequately Supported Its Deliberative Process Withholdings. ........ 30

  B.     The Agency Has Adequately Supported Its Attorney-Client Communications
Withholdings. ........................................................................................................... 33

  C.     The Agency Has Adequately Supported Its Confidential Commercial Information
Withholdings. ........................................................................................................... 35

IV. THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 6
WITHHOLDINGS. ............................................................................................... 37

CONCLUSION............................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ......................................................................... 11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................... 5

*Baker & Hostetler LLP v. Dep't of Com.,*
  473 F.3d 312 (D.C. Cir. 2006) .......................................................... 15

*Burka v. Dep't of Health & Hum. Servs.,*
  87 F.3d 508 (D.C. Cir. 1996) ............................................................ 35

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,*
  40 F.R.D. 318 (D.D.C. 1966) ........................................................... 31

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................... 5

*Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
  600 F. Supp. 114 (D.D.C. 1984) ...................................................... 32

*Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec.,*
  648 F. Supp. 2d 152 (D.D.C. 2009) .................................................. 32

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.,*
  746 F.3d 1082 (D.C. Cir. 2014) ...................................................... 5, 6

*Cleveland v. United States,*
  128 F. Supp. 3d 284 (D.D.C. 2015) .................................................. 31

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) ............................................... 31, 32, 34

*Concepcion v. FBI,*
  606 F. Supp. 2d 14 (D.D.C. 2009) .................................................... 37

*Ctr. for Auto Safety v. NHTSA,*
  809 F. Supp. 148 (D.D.C. 1993) ...................................................... 38

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001) .............................................................................. 32

*Dep't of Just. v. Reps. Comm. for Freedom of the Press,*
  489 U.S. 749 (1989) ........................................................................... 5

*Dep't of State v. Wash. Post Co.,*
  456 U.S. 595 (1982) .................................................................... 37, 38

*Dixon v. United States*,
    381 U.S. 68 (1965) ............................................................................................... 9

*Elec. Frontier Found. v. Dep't of Just.*,
    384 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................... 6

*Elec. Frontier Found. v. Dep't of Just.*,
    739 F.3d 1 (D.C. Cir. 2014) ................................................................................. 5

*ESTI Pipeline Project v. Missouri*,
    484 U.S. 495 (1988) ............................................................................................. 13

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................. 13

*Fed. Open Mkt. Comm. v. Merrill*,
    443 U.S. 340 (1979) ............................................................................................. 35

*Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*,
    71 F.4th 1051 (D.C. Cir. 2023) ........................................................................... 30

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ................................................................................. 8, 15, 16

*FPL Grp. Inc. v. IRS*,
    698 F. Supp. 2d 66 (D.D.C. 2010) ..................................................................... 32

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ........................................................................... 31

*In re Sealed Case*,
    737 F.2d 94 (D.C. Cir. 1984) ............................................................................. 34

*Jud. Watch, Inc. v. Dep't of Just.*,
    20 F.4th 49 (D.C. Cir. 2021) .............................................................................. 32

*Jud. Watch, Inc. v. Reno*,
    Civ. A. No. 00-0723, 2001 WL 1902811 (D.D.C. Mar. 30, 2001) ...................... 36

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) ........................................................................................ 11-12

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ............................................................................. 6

*Manhattan Gen. Equip. Co. v. Comm'r*,
    297 U.S. 129 (1936) ............................................................................................. 9

*Mapother v. Dep't of Just.*,
    3 F.3d 1533 (D.C. Cir. 1993) ............................................................................. 31

*Mead Data Ctr., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ............................................................. 33

*Media Rsch. Ctr. v. Dep't of Just.*,
    818 F. Supp. 2d 131 (D.D.C. 2011) ................................................... 5-6

*Menifee v. Dep't of Interior*,
    931 F. Supp. 2d 149 (D.D.C. 2013) ................................................... 36

*Merrill v. Fed. Open Mkt. Comm. of Fed. Rsrv. Sys.*,
    516 F. Supp. 1028 (D.D.C. 1981) ...................................................... 36

*Nat'l Cable Television Ass'n v. FCC*,
    479 F.2d 183 (D.C. Cir. 1973) ............................................................. 5

*Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................. 31, 32, 33

*Nat'l Sec. Couns. v. CIA*,
    206 F. Supp. 3d 241 (D.D.C. 2016) ..................................................... 6

*Petrol. Info. Corp. v. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992) ..................................................... 31, 32

*Pub. Citizen Health Rsch. Grp. v. FDA*,
    704 F.2d 1280 (D.C. Cir. 1983) ....................................................... 8, 15

*Reliant Energy Power Generation, Inc. v. FERC*,
    520 F. Supp. 2d 194 (D.D.C. 2007) ..................................................... 5

*Reps. Comm. for Freedom of the Press v. CBP*,
    567 F. Supp. 3d 97 (D.D.C. 2021) .................................................. 34-35

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ............................................................. 31

*Rockwell Int'l Corp. v. Dep't of Just.*,
    235 F.3d 598 (D.C. Cir. 2001) ........................................................... 31

*Ryan v. FBI*,
    174 F. Supp. 3d 486 (D.D.C. 2016) ..................................................... 5

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ............................................................... 5

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ....................................................... 33, 34

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ......................................................................... 11

*Vaughn v. Rosen,*
    484 F.2d 820–28 (D.C. Cir. 1973) ................................................ 6

*Wash. Post Co. v. Dep't of Health & Hum. Servs.,*
    690 F.2d 252 (D.C. Cir. 1982) ............................................ 37, 38

*Weisberg v. Dep't of Just.,*
    627 F.2d 365 (D.C. Cir. 1980) ............................................... 5

*Weisberg v. Dep't of Just.,*
    705 F.2d 1344 (D.C. Cir. 1983) ............................................. 5

*Wilson v. FCC,*
    Civ. A. No. 21-0895 (RMM), 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ........... 8

**Statutes**

5 U.S.C. § 552 .................................................. 5, 7, 8, 13, 15, 30, 37

18 U.S.C. § 1905 ................................................................ 9

49 U.S.C. § 30167 ........................................................ 9, 10, 13, 16, 17

49 U.S.C. § 30101 ............................................................... 9

**Rules**

Fed. R. Civ. P. 26 .............................................................. 36

Federal Rule of Civil Procedure 56 ............................................. 5

**Regulations and Regulatory Materials**

49 C.F.R. Part 512 ...................................................... 10, 16, 17

49 C.F.R. Part 512, Subpart E ............................ 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30

49 C.F.R. § 1.95 ............................................................... 10

49 C.F.R. § 512.17 ...................................................... 7, 8, 11, 12, 13, 14

49 C.F.R. § 512.18 ............................................................. 10

49 C.F.R. § 512.19 ............................................................. 10

49 C.F.R. § 512.20 ........................................................... 12, 14

49 C.F.R. § 512.21 ............................................................. 12

49 C.F.R. § 512.23 ........................................................... 12, 13

*Confidential Business Information,* 67 Fed. Reg. 21,198 .................................... 10, 11

Defendants, the Department of Transportation and National Highway Traffic Safety Administration ("Agency" or "NHTSA"), respectfully cross-move for summary judgment and oppose Plaintiff Aaron Greenspan's motion for summary judgment.  As demonstrated in the accompanying *Vaughn* indices and declarations and described further below, Defendants appropriately withheld or redacted the material at issue in this litigation under Freedom of Information Act ("FOIA") Exemptions 4, 5, and 6.  Defendants respectfully request that this Court grant summary judgment in their favor.

## BACKGROUND

Plaintiff, originally represented by counsel, initiated this action on February 3, 2022. Plaintiff filed a First Amended Complaint (ECF No. 5) on March 24, 2022.  Plaintiff filed a Second Amended Complaint (ECF No. 7) on April 19, 2022.  Plaintiff, now proceeding pro se, filed the operative Third Amended Compliant (ECF No. 21) on October 11, 2022.  Initially, Plaintiff brought this action against three defendants—the two that remain defendants in this action and also the Securities and Exchange Commission ("SEC")—but Plaintiff subsequently dropped the SEC as a defendant.  *Compare* Compl. (ECF No. 1) ¶ 1 (suing the SEC), *and* First Am. Compl. (ECF No. 5) ¶ 1 (same), *with* Second Am. Compl. (ECF No. 7) ¶ 1 (dropping the SEC), *and* Third Am. Compl. (ECF No. 21) ¶ 1 (similar).

On January 23, 2023, the Court granted Defendants' partial motion to dismiss the Third Amended Complaint, dismissing Count IV, which sought "a declaratory judgment that Greenspan 'has the right to the immediate production of records under FOIA in all past, present and future FOIA requests where the defendants improperly withheld records' based on third parties' requests for confidential treatment that, according to Greenspan, were 'expired.'"  Order (ECF No. 28) at 1

(quoting Third Am. Compl. (ECF No. 21) ¶ 72).  The Court denied Plaintiff's motion for reconsideration on May 17, 2023.  *See* Order (ECF No. 33).

The remaining three counts in the Third Amended Complaint each concern one of three FOIA requests that Plaintiff submitted to the Agency on March 7, March 8, and May 27, 2021. Third Am. Compl. (ECF No. 21) ¶¶ 49–63; *see also* Declaration of Allison Hendrickson ("Hendrickson Decl.," attached) ¶ 4.  The three FOIA requests generally concern communications between Tesla and the Agency.

More specifically, Plaintiff's March 7, 2021, request—assigned NHTSA Request No. ES21-000275 and at issue in Count I, *see* Third Am. Compl. (ECF No. 21) ¶¶ 49–53—sought "[c]opies of any and all e-mails (with attachments), letters and/or subpoenas to or from Tesla, Inc. (domain names tesla.com or teslamotors.com) from June 3, 2019 through present regarding self-driving vehicles, autonomous vehicles, smart summon, and/or 'robo-taxis' (with or without the hyphen)."  Second Am. Compl., Ex. 1 (ECF No. 7-1) at 3; *see also* Third Am. Compl. (ECF No. 21) ¶ 8; Jt. Status Rep. (ECF No. 37) ¶ 1.  Second, Plaintiff's March 8, 2021, request— assigned NHTSA Request No. ES21-000180 and at issue in Count II, *see* Third Am. Compl. (ECF No. 21) ¶¶ 54–58—sought "[a]ny written disclosures and/or e-mails to or from NHTSA employee Ajit Alkondon (ajit.alkondon@dot.gov) regarding his personal investments and corporate entities in which he has an ownership or managerial stake (Magellan Tutoring LLC, Pineapple Love Properties LLC and Lucrum Properties LLC) from January 1, 2007 to present" and "[a]ny e-mails between ajit.alkondon@dot.gov and any tesla.com e-mail address from January 1, 2016 to present."  Third Am. Compl. ¶ 21; *see also* Jt. Status Rep. (ECF No. 37) ¶ 1; Hendrickson Decl. ¶ 4.  Lastly, Plaintiff's May 27, 2021, request—assigned NHTSA Request No. ES21-000398 and at issue in Count III, *see* Third Am. Compl. (ECF No. 21) ¶¶ 59–63—sought "[a]ll e-mails (to or

from the tesla.com domain name, or generated by NHTSA or [Department of Transportation]), memoranda, presentations, briefings, meeting notes, videoconference/call notes, test results, or other documents from February 1, 2021 through present regarding the disabling and/or removal of radar from certain Tesla vehicles."  Second Am. Compl., Ex. 4 (ECF No. 7-1) at 10.

On November 16, 2024, prior to the conclusion of the Agency's processing of material responsive to Plaintiff's three FOIA requests, Plaintiff "narrow[ed] the FOIA requests at issue in Case No. 1:22-cv-00280-DLF [i.e., this case] to only those documents that have been processed thus far."  Pl.'s Email (ECF No. 39-1) at 2; *see also* Jt. Status Rep. (ECF No. 37) ¶ 7 (estimating, in the last status report before Plaintiff's email, that at least 600 potentially responsive pages remained to be processed for one request, under 100 potentially responsive pages remained to be processed for a second request, and between 1,000 and 1,400 potentially responsive pages, excluding spreadsheets, images, video records, and .txt files, remained to be processed for a third request).  The Agency accepted Plaintiff's narrowing of the requests.  *See, e.g.*, Defs.' Resp. (ECF No. 39) ¶ 3 ("NHTSA has accepted Plaintiff's narrowing of this case, and this case may proceed to summary judgment in light of Plaintiff's narrowing of the FOIA requests to just the documents produced to date in connection with this litigation, which is still a significant volume[.]").

The documents processed in response to the three FOIA requests comprise 23,898 pages. *See, e.g.*, Hendrickson Decl. ¶ 14.  The overwhelming majority of the withholdings in this litigation concern Exemption 4, *see* Pl.'s Br. (ECF No. 38-1) at 9; *compare* Exemption 4 *Vaughn* Index (Ex. 1), *with* Exemptions 5/6 *Vaughn* Index (Ex. 2), although there are also Exemption 5 and Exemption 6 redactions within the material, *see* Declaration of Shonda Humphrey ("Humphrey Decl.," attached) ¶¶ 18, 24.  Under Exemption 4, the Agency withheld in full 1,385 documents amounting to 20,341 pages, 159 Excel spreadsheets, and 64 media files.  Hendrickson Decl. ¶ 14.

Under Exemption 5's deliberative process privilege, the Agency withheld material in 111 documents. Humphrey Decl. ¶ 18. Under Exemption 5's attorney-client communications privilege, the Agency withheld material in fifty-nine documents, with all of this material also withheld under the deliberative process privilege. *Id.* Under Exemption 5's confidential commercial information privilege, the Agency withheld conference call numbers and passcodes in four documents. *Id.* Thus, in total, material was withheld under Exemption 5 in 115 documents. *Id.* Lastly, under Exemption 6, the Agency withheld personally identifying material contained within 684 documents, 127 Excel spreadsheets, and seventeen media files. *Id.* ¶ 24. Defendants note that many of the Exemption 6 withholdings appear in documents that were withheld in full under Exemption 4. *Id.*

As further explained below, Defendants have described the withholdings and the harm that would ensue from further disclosure in three declarations and two *Vaughn* indices. *See, e.g.*, Hendrickson Decl.; Humphrey Decl.; Declaration of Eddie Gates ("Gates Decl.," attached); Exemption 4 *Vaughn* Index (Ex. 1); Exemptions 5/6 *Vaughn* Index (Ex. 2). Defendants' robust materials amply support Defendants' withholdings in this action.

On December 5, 2024, Plaintiff moved for summary judgment (ECF No. 38). The sole basis for Plaintiff's motion arguments is a reprise of Plaintiff arguments regarding Tesla's purportedly expired confidential treatment requests. The Court has already rejected this argument twice, and it should reject it a third time, as discussed further below.

Defendants now cross-move for summary judgment and oppose Plaintiff's summary judgment motion.

**LEGAL STANDARD**

FOIA cases are typically decided on motions for summary judgment. *Ryan v. FBI*, 174 F. Supp. 3d 486, 490 (D.D.C. 2016), *summ. aff'd*, No. 16-5108, 2016 WL 6237841 (D.C. Cir. Sept. 16, 2016). Summary judgment is granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In the FOIA context, an agency is entitled to summary judgment if it "proves that it has fully discharged its obligations" under FOIA. *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007) (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). To do so, an agency must prove that each document responsive to the request(s) has been produced, is unidentifiable, or is wholly exempt from disclosure. *Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).

If redacting or withholding records, the agency must prove that its claimed exemptions apply. *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (citing *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989)); *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014); 5 U.S.C. § 552(a)(4)(B). To do so, the agency must submit evidence proving that it is "logical" or "plausible" that the invoked FOIA exemptions apply. *Media Rsch. Ctr. v. Dep't of Just.*, 818 F.

Supp. 2d 131, 137 (D.D.C. 2011) (citing *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). An agency can meet this burden by submitting affidavits, declarations, a *Vaughn* index, or any combination of these methods. *Nat'l Sec. Couns. v. CIA*, 206 F. Supp. 3d 241, 249 (D.D.C. 2016), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020); *see also Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973). When relying on an affidavit or declaration, the evidence must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [that the evidence is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *CREW*, 746 F.3d at 1088 (quoting *Larson*, 565 F.3d at 862).

## ARGUMENT

Defendants respectfully submit that they have adequately supported their withholdings under FOIA Exemptions 4, 5, and 6.

## I.  THE ADEQUACY OF THE SEARCH IS NOT AT ISSUE BECAUSE PLAINTIFF HAS NARROWED THE FOIA REQUESTS TO THE MATERIALS PREVIOUSLY PROCESSED.

On November 16, 2024, Plaintiff "narrow[ed] the FOIA requests at issue in Case No. 1:22-cv-00280-DLF [i.e., this case] to only those documents that have been processed thus far." Pl.'s Email (ECF No. 39-1) at 2. Defendants accepted Plaintiff's narrowing. Defs.' Resp. (ECF No. 38) ¶ 3. As a result, the adequacy of the search is not at issue, as the universe of responsive documents has been redefined as those that were previously processed in response to these three FOIA requests. *See, e.g.*, *Elec. Frontier Found. v. Dep't of Just.*, 384 F. Supp. 3d 1, 9 (D.D.C. 2019). Defendants have identified all such withholdings in their *Vaughn* indices. *See, e.g.*, Exemption 4 *Vaughn* Index (Ex. 1); Exemptions 5/6 *Vaughn* Index (Ex. 2); *see also* Hendrickson Decl. ¶ 24.

## II.    THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 4 <u>WITHHOLDINGS.</u>

Plaintiff's sole argument in support of his summary judgment motion is that the purported expiration of Tesla's confidential treatment requests should foreclose the Agency from withholding any material under Exemption 4; Plaintiff does not appear to take issue with the Agency's Exemption 5 or 6 assertions.  The Court has already rejected Plaintiff's argument twice before, *see, e.g.*, Order (ECF No. 28) at 2–4 & n.2; Order (ECF No. 33) at 5, and it should reject it a third time now.  Turning to the merits of the Agency's Exemption 4 withholdings, which this Court reviews de novo, 5 U.S.C. § 552(a)(4)(B), the Court should find that Defendants' evidentiary support, particularly the Declarations of Allison Hendrickson and Eddie Gates and Defendants' Exemption 4 *Vaughn* index, adequately supports withholding the material in question.

### A.    Plaintiff Misconstrues the Meaning and Effect of the Timing Requirement for Ruling on Confidentiality Requests.

Plaintiff's summary judgment motion is premised on the assumption that a request for confidential treatment regarding information submitted to the Agency expires if the Agency does not act upon it within twenty working days.  Plaintiff urges that the Agency's regulation, 49 C.F.R. § 512.17(a), imposes a mandatory twenty-working-day deadline that runs from the date the submitter requested confidential treatment of its business information or, alternatively, from the date a FOIA requestor submits a FOIA request that implicates the material in question.  Plaintiff urges, based on no applicable legal authority, that the consequence of the Agency failing to rule promptly on a request for confidential treatment is that the Agency must not withhold any of the company's material under Exemption 4.  This is wrong for at least five reasons.

First, agency regulations do not alter the statutory instruction under FOIA that information falling under Exemption 4 is not subject to disclosure.  As the Court has confirmed previously, "[n]owhere does the regulation say that requests for confidential treatment expire if not ruled on

twenty [working] days after their receipt, so invoking Exemption 4 to withhold records is not automatically unjustified simply because the Administration relied on a confidential treatment request more than twenty days old."  Order (ECF No. 33) at 5.  The alternative conclusion—that a purported violation of the regulation requires a court to reject any Exemption 4 assertion—would be inconsistent with the well-settled requirement that the Court "examine[s] de novo whether [an agency] properly withheld materials under FOIA Exemption 4," Order (ECF No. 28) at 3 (alterations in original; internal quotation marks omitted; quoting *Wilson v. FCC*, Civ. A. No. 21-0895 (RMM), 2022 WL 4245485, at *7 (D.D.C. Sept. 15, 2022)), and that "an agency's own assurance of confidentiality is 'relevant—but not strictly required,'" *id.* (quoting *Wilson*, 2022 WL 4245485, at *7); *see also* 5 U.S.C. § 552(a)(4)(B) ("[T]he court shall determine the matter de novo[.]").  As the Supreme Court has confirmed, "just as we cannot properly *expand* Exemption 4 beyond what its terms permit, we cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms."  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (emphasis in original; citation omitted); *see also Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983) ("Congress has made clear both that the federal courts, and not the administrative agencies, are ultimately responsible for construing the language of the FOIA, and that agencies cannot alter the dictates of the Act by their own express or implied promises of confidentiality." (citations omitted)).  Accordingly, 49 C.F.R. § 512.17(a) does not impose an extra-statutory requirement that a business submitter must suffer the disclosure of its confidential business information because the Agency allegedly took too long to adjudicate its request for confidential treatment.

Second, the Agency has legal obligations to protect confidential information apart from its regulation, and public disclosure of such information is statutorily allowed in only specifically

enumerated ways. *See* 49 U.S.C. § 30167(a). By statute, the Agency is authorized to disclose information related to a confidential matter only: "if the confidentiality of the information is preserved" or "when the Secretary of Transportation decides that disclosure is necessary to carry out section 30101 of this title." *Id.*; *see also id.* § 30101 ("The purpose of this chapter is to reduce traffic accidents and deaths and injuries resulting from traffic accidents."). If an Agency officer or employee "publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information" that "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association," then that officer or employee "shall be fined under this title, or imprisoned not more than one year, or both" and "shall be removed from office or employment." 18 U.S.C. § 1905. Since these restrictions on the public disclosure of confidential information are statutory, they may not be altered or augmented by the Agency's regulations. *See Dixon v. United States*, 381 U.S. 68, 74–75 (1965) ("The statute defines the rights of the taxpayer and fixes a standard by which such rights are to be measured. The regulation constitutes only a step in the administrative process. It does not, and could not, alter the statute." (quoting *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 135 (1936))).

Here, disclosing confidential information to Plaintiff would not preserve the information's confidentiality, so disclosure would be permitted only "when the Secretary of Transportation decides that disclosure is necessary." 49 U.S.C. § 30167(a). The position argued by Plaintiff seeks to create a completely new way for confidential information to be disclosed: the forfeiture of confidentiality protections based on how long the agency takes to make a confidentiality decision. Plaintiff's new avenue for disclosure of confidential business information has no basis in the

statute. In fact, Plaintiff's novel basis for disclosure would directly conflict with the other grounds for disclosure in § 30167. Specifically, Plaintiff's argument rewrites the statutory demand in 49 U.S.C. § 30167 that there be an affirmative act by the Secretary instead to permit inaction or a failure to follow a regulatory timeline to serve as the basis for disclosure. Congress, however, elected to require the Secretary of Transportation (whose authority here is delegated to the Agency, 49 C.F.R. § 1.95) to decide affirmatively that disclosure is necessary before confidential information may be disclosed. 49 U.S.C. § 30167(a).

Third, the Agency's regulations at issue, found at 49 C.F.R. Part 512, generally afford rights and obligations to those who submit confidential information to the Agency, not to FOIA requestors. Aside from the "General Provisions," the subparts and sections of Part 512 are specifically addressed to submitters of confidential information, not to FOIA requestors. *See id.* §§ 512.4–512.23; *see also* Confidential Business Information, 67 Fed. Reg. 21,198, 21,198 (Apr. 30, 2002) (explaining, in the notice of the rule change, that "changes are being proposed to make the regulation clearer and easier to follow, particularly for organizations or individuals who do not submit materials to the agency on a regular or frequent basis"). For instance, Section 512.18 is titled "[h]ow will I be notified of the confidentiality determination," and it accordingly addresses how the submitter of confidential information will be notified. 49 C.F.R. § 512.18. Likewise, the following section is titled "[w]hat can I do if I disagree with the determination," and it again describes the rights afforded to submitters of confidential information whose requests for confidential treatment are denied. *Id.* § 512.19. As these section titles make apparent, Part 512 provides instructions, requirements, and other information to those requesting confidential treatment for information submitted to the Agency. It does not create additional rights for FOIA requestors.

Fourth, even with respect to the submitters of confidential information, the timeframes set forth in the regulation are not mandatory. The title of the regulation in question is: "How long *should* it take to determine whether information is entitled to confidential treatment?" *Id.* § 512.17 (emphasis added); *see also* 67 Fed. Reg. at 21,200 ("This subpart of the proposed regulation would also cover such procedural matters as who makes confidentiality decisions within the agency, how long it *should* take the agency to make decisions on confidentiality requests, and how submitters who request confidential treatment for their information are notified of the agency's decision." (emphasis added)). Section 512.17(a) includes two separate timelines for requests for confidential treatment when information is required under FOIA, but explicitly provides that "these time periods may be extended by the Chief Counsel for good cause shown or on request from any person." 49 C.F.R. § 512.17(a). As for information not requested under FOIA, the regulation provides that "the determination of confidentiality will be made within a reasonable period of time, at the discretion of the Chief Counsel." *Id.* § 512.17(b).

To the extent that Plaintiff urges that the *Accardi* doctrine should apply, *see* Pl.'s Br. (ECF No. 38-1) at 12 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)), he fails to grapple with the fact that 49 C.F.R. § 512.17(a) does not in any way imply that it confers rights on FOIA requestors, and it does not imply a right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citation omitted). Without a plain indication of Congressional intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* at 287 (quoting *Lampf, Pleva, Lipkind,*

*Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring in part and concurring in judgment)).  There is nothing remotely similar to a plain indication of Agency intent—let alone Congressional intent—in 49 C.F.R. § 512.17(a)—that would suffice to create a private right of action to a FOIA requestor or would deputize FOIA requestors to enforce rules intended for submitters of confidential business information.

Fifth, a complete reading of Part 512 makes it clear that, other than in the circumstances listed in the statutory exceptions discussed above, the Agency cannot release information for which confidential treatment has been requested unless and until it determines the information is not, in fact, confidential.  Section 512.20 explicitly provides that "[i]nformation received by NHTSA, for which a properly filed confidentiality request is submitted, will be kept confidential until the Chief Counsel makes a determination regarding its confidentiality.  Such information will not be disclosed publicly, except in accordance with this part."  *Id.* § 512.20.  This regulation explicitly prohibits disclosure of information subject to a confidentiality request prior to a determination regarding its confidentiality; therefore, it is logically untenable that another section of Part 512 would allow disclosure of the same information without a determination having been made, as Plaintiff argues.  The regulations go on to say that "all materials determined not to be entitled to confidential treatment will be disclosed to the public."  *Id.* § 512.21(a).  As such, the Agency cannot disclose information subject to a request for confidential treatment unless and until it determines that confidential treatment is not warranted.

A subsequent section explicitly lists exceptions to this general rule for both "[i]nformation that has been claimed or determined to be confidential."  *Id.* § 512.23(a).  In other words, the list of exceptions contemplates information submitted under a request for confidential treatment regardless of whether the agency has yet made a determination.  This list includes the statutory

exception for public disclosure of confidential information discussed above. *See, e.g.*, 49 U.S.C. § 30167(a) ("Information . . . related to a confidential matter . . . may be disclosed only in the following ways: . . . to the public when the Secretary of Transportation decides that disclosure is necessary[.]"); *see also* 49 C.F.R. § 512.23(a)(1)–(a)(3). Notably missing from this list is the situation suggested by Plaintiff where the request for confidential treatment has allegedly "expired." Thus, Plaintiff's belief that the result of a purported violation of the deadlines set forth in 49 C.F.R. § 512.17(a) must be the immediate disclosure of this confidential information is foreclosed both by Part 512 and 49 U.S.C. § 30167(a).

Lastly, Plaintiff urges that the Agency should be estopped from relying on purportedly expired requests for confidential business information because of a decision on one of his prior administrative appeals concerning a FOIA request not at issue in this litigation. Pl.'s Br. (ECF No. 38-1) at 15–16; *see also* Admin. Appeal Decision (ECF No. 26-1). As an initial matter, even if Plaintiff were correctly reading that decision, which he is not, it would not estop the Agency in other actions going forward. An administrative appeal decision for a different FOIA request has no precedential value, and the Court decides this action de novo. *See* 5 U.S.C. § 552(a)(4)(B) ("[T]he court shall determine the matter de novo[.]"). In addition, agencies are bound by their statutory authorities when adjudicating administrative decisions. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000); *ESTI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988). As such, even if Plaintiff were reading this prior decision correctly, that decision could not validly override the statutory protections on disclosing confidential business information.

Moreover, Plaintiff continues to misread the administrative appeal decision. *See* Admin. Appeal Decision (ECF No. 26-1) at 2–5. For the FOIA request at issue in that decision, the Agency issued a final FOIA response before a final determination had been reached on requests for

confidential treatment that pertained to records encompassed by the FOIA request. *Id.* at 4. Accordingly, on administrative appeal, the Agency's Chief Counsel remanded the request to the Agency's FOIA Office to reopen the FOIA request until a final confidentiality determination could be made for those records. *Id.* In doing so, the Chief Counsel noted that the ordinary regulatory timeframe for a determination on the confidential treatment requests under the Agency's regulations had passed. *See id.* at 4 ("NHTSA regulations further provide that 'when information claimed to be confidential is requested under the [FOIA],' the determination will ordinarily be made within twenty working days.'" (quoting 49 C.F.R. § 512.17(a))). As such, the Chief Counsel remanded for this confidentiality determination to be completed in order to complete the FOIA response. *Id.* This is consistent with the Chief Counsel's discretion to extend Section 512.17(a)'s regulatory timelines "for good cause shown or on request from any person." 49 C.F.R. § 512.17(a). At no point in this administrative decision, did the Agency suggest (as Plaintiff argues) that the records at issue were no longer eligible for confidentiality because a confidentiality determination had not yet occurred.

Indeed, the administrative appeal decision reiterated the framework that "[p]ursuant to NHTSA regulations, when a properly filed confidentiality request is submitted for information submitted to the agency, it 'will be kept confidential until the Chief Counsel makes a determination regarding its confidentiality.'" Admin. Appeal Decision (ECF No. 26-1) at 3–4 (quoting 49 C.F.R. § 512.20). Nothing in the administrative appeal, the Agency's regulations, or the governing statutes permits statutorily protected confidentiality interests of third parties to be waived due to the Agency's purported delay in adjudicating confidentiality requests.

The Court has already twice grappled with Plaintiff's argument regarding the Agency's regulation. *See, e.g.*, Order (ECF No. 28) at 2–4 & n.2; Order (ECF No. 33) at 5. The Court should

reaffirm what it has said before: "[n]owhere does the regulation say that requests for confidential treatment expire if not ruled on twenty [working] days after their receipt, so invoking Exemption 4 to withhold records is not automatically unjustified simply because the Administration relied on a confidential treatment request more than twenty days old."  Order (ECF No. 33) at 5.  Regardless as to the meaning of the word "request" in the regulation and when the twenty-working-day deadline is triggered, it does not foreclose the Agency from asserting Exemption 4, nor does it punish a submitter of confidential business information for a purported delay attributable to the Agency.

> **B.    The Materials Withheld Under Exemption 4 Are Confidential Business Information, and Further Disclosure Thereof Is Reasonably Expected to Cause Foreseeable Harm.**

FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings" and are protected so long as the submitter of the information has a "commercial interest" in them.  *Pub. Citizen*, 704 F.2d at 1290; *see also Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006).  Such information is "confidential" under Exemption 4 if it is "customarily kept private, or at least closely held, by the person imparting it."  *Argus Leader*, 588 U.S. at 434.  In *Argus Leader*, the Supreme Court held that commercial or financial information is "confidential" within the meaning of Exemption 4 "[a]t least" where the information is "customarily and actually treated as private by its owner" and, perhaps, "provided to the government under an assurance of privacy."  *Id.* at 440.  As demonstrated below, the Agency properly withheld under Exemption 4 the confidential commercial information that Tesla submitted to the government.

All the material withheld under Exemption 4 is "technical and proprietary information" that "Tesla does not disclose . . . publicly in the ordinary course of its business." Gates Decl. ¶ 6. "Tesla takes extensive measures to guard and protect this information even internally" because "[p]ublic disclosure would enable competitors to gain substantial competitive knowledge and unfair advantage over Tesla." *Id.* To the extent this information is released outside Tesla, it is "to obtain advice and assistance from counsel and other confidential advisors" "under binding nondisclosure agreements or similar mechanisms." *Id.*

Tesla provided its confidential business information to the Agency "under an assurance that the information will remain confidential and will be kept private." *Id.* ¶ 9. The Agency's "framework of statutory and regulatory provisions that govern the submission of material for which confidentiality is requested provides an assurance of privacy that confidential business information will be protected from disclosure except in limited circumstances." *Id.* (citing 49 U.S.C. § 30167; 49 C.F.R. Part 512, Subpart E); *see also* Hendrickson Decl. ¶ 16; 49 U.S.C. § 30167(a) (listing the narrow exceptions to the statutory confidentiality protection).

The material withheld under Exemption 4 falls into myriad categories, and the Gates Declaration carefully cross-references the pagination used in Defendants' Exemption 4 *Vaughn* index with the material at issue. *See, e.g.*, Gates Decl. ¶¶ 11–66. Defendants have also provided significant details about each document individually on its 533-page Exemption 4 *Vaughn* index (Ex. 1), going above and beyond the category descriptions recounted below. To give an example from Defendants' *Vaughn* index, the explanation for the first document on Defendants' Exemption 4 *Vaughn* index states:

> This document contains information about Tesla's vehicle data and onboard media availability and retrieval and Tesla's brake system design and performance. Tesla requested that this information be given confidential treatment under Exemption 4 of FOIA and submitted the request in accordance with agency regulations covering

such requests.  *See* 49 C.F.R. Part 512.  Tesla represented that it treats this information as confidential as further described in Tesla's declaratory support. Based on Tesla's affirmation, Tesla customarily and actually keeps this information private, and Tesla provided this information to NHTSA under an assurance of confidentiality.  Further, public disclosure of this information increases the risk that competitors will gain Tesla's proprietary information on data available to Tesla and how Tesla is able to retrieve and learn from such data as well as brake design and performance.  Publicly releasing this information would foreseeably harm Tesla's commercial or financial interest in keeping it private.  Submission under NHTSA's statutory and regulatory framework governing confidential information provides an assurance that any such information determined to be confidential will be protected from public disclosure except in limited circumstances.  *See* 49 U.S.C. § 30167; 49 C.F.R. Part 512, Subpart E.  If NHTSA were to release the withheld information, it would increase the risk that regulated entities will not provide similar confidential information to NHTSA in the future and, therefore, would harm NHTSA's interest in obtaining similar information prospectively, which is critical to its vehicle safety interest.  NHTSA also considered whether any further information within this record could be segregated and disclosed, but any further disclosure will cause harm to Tesla and also to NHTSA as it endeavors to fulfill its important mission of ensuring vehicle safety by continuing to receive confidential information from vehicle manufacturers.  As such, NHTSA concluded that the withheld information was entitled to confidential treatment pursuant to FOIA Exemption 4.

Defs.' Exemption 4 *Vaughn* Index (Ex. 1) at 1 (citations cleaned up).  In an effort to crystallize the various Exemption 4 materials identified in Defendants' lengthy Exemption 4 *Vaughn* index, Defendants sort this material into forty-five categories below; however, to the extent any of these category descriptions are deemed insufficiently descriptive, Defendants respectfully refer to their Exemption 4 *Vaughn* index (Ex. 1), which addresses each document individually.

The first category is "Tesla's vehicle software availability, development and deployment strategies and processes."  Gates Decl. ¶ 11.  Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into aspects of Tesla's engineering and business operations which would be used to improve their own software and development strategies and processes."  *Id.*

The second category is "Tesla's engineering assessment of field incidents."  *Id.* ¶ 12; *accord id.* ¶¶ 29, 47.  Public disclosure thereof "would cause competitive harm to Tesla by giving

Tesla's competitors insight into how Tesla's collects and uses available data, and how Tesla engineers assess incidents in the field which would be used to improve their own data collection processes and field incident assessments and ultimately improve vehicle design." *Id.* ¶ 12; *see also id.* ¶¶ 29, 47.

The third category is "the volume of Tesla vehicles that requested access to [Tesla's Full Self-Driving] Beta as of the date listed" on the record. *Id.* ¶ 13; *see also Tesla, Model Y Owner's Manual: Full Self-Driving (Supervised)*, https://www.tesla.com/ownersmanual/modely/en_us/GUID-2CB60804-9CEA-4F4B-8B04-09B991368DC5.html (last accessed Mar. 14, 2024). Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla vehicle capability, feature availability and business planning and operations which would be used to improve their own vehicle capability and feature availability." Gates Decl. ¶ 13.

The fourth category is "the terms of Tesla's Early Access Program." *Id.* ¶ 14. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's new feature evaluation process which would be used to improve their own vehicle features and customer experience." *Id.*

The fifth category is "details regarding participation in Tesla's Early Access Program and employee pilot program." *Id.* ¶ 28. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's new feature evaluation process which would be used to improve their own vehicle features and customer experience." *Id.*

The sixth category is "detailed information about the performance, design and operation of Autopilot features including Autopilot features' control authority over certain aspects of the driving task, how and when the vehicle may communicate with the driver when Autopilot features are engaged, Tesla's approach to driver engagement when Autopilot features are engaged, the

effect of driver inputs on Autopilot features, and details about scenarios when a driver is prompted to take over the driving task." *Id.* ¶ 15. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors detailed information about its software capabilities and strategies and business decisions behind how Tesla's software works" and "would be used by competitors to improve their own software and vehicle design." *Id.*

The seventh category is "Tesla vehicle VINs [i.e., vehicle identification numbers] equipped with [Full Self-Driving] (Beta), the date on which [Full Self-Driving] (Beta) was installed, and whether the vehicle is owned by an employee or non-employee." *Id.* ¶ 16. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors information about the availability and interest in Tesla's products which would be used to improve their own sales and marketing strategies." *Id.*

The eighth category is "Tesla vehicle VINs equipped with Autosteer on City Streets as of a particular date." *Id.* ¶ 33. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors information about the availability and interest in Tesla's products which would be used to improve their own sales and marketing strategies." *Id.*

The ninth category is "internal diagnostic and service data and documentation." *Id.* ¶ 17. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how its service teams diagnose and repair vehicles which would be used to improve their own vehicle diagnostic processes, documentation and record-keeping." *Id.*

The tenth category is "articles and announcements published through Tesla's internal platform for communications with sales, service, and delivery teams." *Id.* ¶ 18. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's internal platform as well as the content of technical communications about Tesla vehicles and

features sent through the platform," and "[c]ompetitors would use this information to improve their own processes and strategies to communicate with their field teams as well as to improve their products." *Id.*

The eleventh category is "articles published on Tesla's internal platform for communication between service and engineering departments." *Id.* ¶ 19. Public disclosure thereof "would cause competitive harm by giving Tesla's competitors insight into Tesla's internal platform as well as the content of technical communications about Tesla vehicles and features sent through the platform," and "[c]ompetitors would use this information to improve their own processes and strategies to communicate between the service and engineering departments as well as to improve their products." *Id.*

The twelfth category is "vehicle data logs." *Id.* ¶ 20; *accord id.* ¶¶ 31, 59. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into the type of information Tesla is able to collect from vehicles, how the data is collected and in what format, and how Tesla uses vehicle data to evaluate field incidents" and "would enable competitors to improve their own data collection practices and ultimately improve their products and customer experience. *Id.*; *see also id.* ¶¶ 31, 59.

The thirteenth category is "Tesla's data logs," which "reveals the type of information Tesla is able to collect from vehicles, how the data is collected and in what format, and how Tesla can use vehicle data to evaluate field incidents." *Id.* ¶ 42. Public disclosure thereof "would enable competitors to improve their own data collection practices and ultimately improve their products and customer experience." *Id.*

The fourteenth category is "exterior vehicle camera clips and exterior vehicle camera clips with engineering data overlay." *Id.* ¶ 21; *see also id.* ¶ 44. Public disclosure thereof "would cause

competitive harm to Tesla by giving Tesla's competitors insight into how Tesla vehicles record and transmit data and how Tesla uses recordings to assess field incidents," and "Tesla's competitors would use this information to improve their own camera capability, data collection and assessment of field incidents." *Id.* ¶ 21; *see also id.* ¶ 44.

The fifteenth category is "vehicle information from an internal Tesla service and engineering tool." *Id.* ¶ 22; *accord id.* ¶ 63. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how the tool works and the tool's capability as well as the vehicle data made available through use of the tool," and "[c]ompetitors would use this information to improve their own service and engineering tools and diagnostic capability." *Id.* ¶ 22; *see also id.* ¶ 63.

The sixteenth category is "information about software updates prior to the release date." *Id.* ¶ 23; *accord id.* ¶ 57. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's software evaluation and release process which would be used to improve their own processes related to software design and release." *Id.* ¶ 23; *see also id.* ¶ 57.

The seventeenth category comprise "confidential settlement agreements and general releases and exhibits." *Id.* ¶ 24. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors access to the terms and conditions of legal settlements and releases to which Tesla is a party, and terms and conditions that the parties intended and expected would remain confidential," and "Tesla's competitors would use this information in their own litigation or litigation against Tesla to Telsa's financial and competitive detriment." *Id.*

The eighteenth category is "information about Tesla's vehicle software development, testing, validation and release processes and strategies." *Id.* ¶ 26. Public disclosure thereof "would

cause competitive harm to Tesla by giving Tesla's competitors insight into aspects of Tesla's engineering and business operations which would be used to improve their own software and development strategies and processes." *Id.*

The nineteenth category is material identifying "the process by which Tesla collects and learns from vehicles through data collection and the type of data Tesla is able to collect from vehicles." *Id.* ¶ 27. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into the type of information Tesla is able to collect from vehicles, how the data is collected and in what format, and how Tesla uses vehicle data to evaluate field incidents" and "would enable competitors to improve their own data collection practices and ultimately improve their products and customer experience." *Id.*

The twentieth category comprises "details of the capability of Tesla's vehicle technology." *Id.* ¶ 30. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors detailed information about its software capabilities and strategies and business decisions behind how Tesla's software works," and it "would be used by competitors to improve their own software and vehicle design." *Id.*

The twenty-first category is "information about not-yet-release[d] vehicle software." *Id.* ¶ 31. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's software evaluation and release process, and engineering and business operations which would be used to improve their own processes and strategies related to software design and release." *Id.*

The twenty-second category is "intervention and mileage statistics for Autosteer on City Streets." *Id.* ¶ 34. Public disclosure thereof "would cause competitive harm to Tesla by giving

Tesla's competitors data about how the technology is used by customers which would be used to improve their own vehicle technology." *Id.*

The twenty-third category is "Summon usage rates." *Id.* ¶ 35. "Summon" is a Tesla feature for parking and retrieving a vehicle. Tesla, *Model 3 Owner's Manual: Summon*, https://www.tesla.com/ownersmanual/model3/en_us/GUID-7D207174-88CD-4795-8265-9162A72AA578.html (last accessed Mar. 14, 2025). Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors information about the availability and interest in Tesla's products which would be used to improve their own sales and marketing strategies." Gates Decl. ¶ 35.

The twenty-fourth category is "field reports involving Summon including the firmware version, location, customer narrative, date and VIN." *Id.* ¶ 36. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into data available to Tesla and how Tesla collects and evaluates available data when an incident in the field occurs which would be used to improve their own data collection and assessment of field incidents." *Id.*

The twenty-fifth category is "data related to reports of field incidents while Autopilot was engaged including vehicle hardware and firmware information, available vehicle data, and litigation status." *Id.* ¶ 37. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into data available to Tesla and how Tesla collects and evaluates available data when an incident in the field occurs which would be used to improve their own data collection and assessment of field incidents." *Id.*

The twenty-sixth category is "information about Tesla's entire United States fleet, including [Autopilot and Full Self-Driving] hardware version, warranty and delivery information, drivetrain, delivery location, and vehicle production volume." *Id.* ¶ 39. Public disclosure thereof

"would cause competitive harm to Tesla," as "[c]ompetitors would use this information to adjust their own equipment options to better compete against Tesla and make their production-, sales- and marketing-related decisions much to Tesla's detriment." *Id.*

The twenty-seventh category is "details related to Tesla's vehicle data and onboard video availability and retrieval." *Id.* ¶ 40. Public disclosure thereof "would cause competitive harm to Tesla by giving competitors insight into data available to Tesla and how Tesla is able to retrieve and learn from such data which competitors would use to improve their own vehicle data-related processes." *Id.*

The twenty-eighth category is "proprietary information about Tesla's brake system design and performance." *Id.* ¶ 41. This is particularly "commercially valuable" information because, in Tesla's opinion, "design and performance of Tesla vehicles is what sets it apart from competitors and helps build its brand and recognition among consumers." *Id.* Public disclosure of this information would allow competitors to "use this information to improve their own vehicle design and performance in a highly competitive market." *Id.*

The twenty-ninth category is "detailed design specifications related to torque production by motor type." *Id.* ¶ 43. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into its design specifications and torque capability which they would use to improve their own vehicle design and capability." *Id.*

The thirtieth category is "communications between Tesla's field teams and customers regarding vehicle diagnostic information." *Id.* ¶ 45; *see also id.* ¶ 53. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla communicates and gathers diagnostic information from customers," "[c]ompetitors would use this information to improve their own customer service." *Id.* ¶ 45; *see also id.* ¶ 53.

The thirty-first category is "documents related to customer arbitration including vehicle sale and registration information, customer complaint narrative, service invoices, details of resolution sought by customer." *Id.* ¶ 51. "Consumer arbitrations are confidential, non-public proceedings." *Id.* Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into the nature of unverified consumer complaints and allegations against Tesla," and "[c]ompetitors would use information from customer arbitrations to gain insights into Tesla's sales and registration processes, how Tesla addresses consumer complaints, and the confidential methods Tesla uses to resolve customer complaints." *Id.*

The thirty-second category is "a Tesla service invoice." *Id.* ¶ 46. Public disclosure of the invoice "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla Service evaluates, diagnoses and repairs vehicles," and "[t]his information would be used by competitors to improve their own service-related processes and customer service." *Id.*

The thirty-third category is "consumer complaints, field reports, crash, injury, and fatality reports, property damage claims, arbitration proceedings, and lawsuits" relating to a field incident. *Id.* ¶ 49. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's process for tracking and assessing field incidents which would be used to improve their own processes and responses to incidents in the field." *Id.*

The thirty-fourth category is "Tesla's engineering documentation and assessment of field incidents and trends." *Id.* ¶ 50. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla's collects and uses available data, and how Tesla engineers assess incidents in the field which would be used to improve their own data collection processes and field incident assessments and ultimately improve vehicle design." *Id.*

The thirty-fifth category is "customer vehicle repair histories from internal Tesla databases." *Id.* ¶ 52. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insights into Tesla's diagnostic and repair processes and documentation which would be used to improve their own processes." *Id.*

The thirty-sixth category is "Tesla service notes, assessments, and internal communications." *Id.* ¶ 54. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla service diagnoses, records, and repairs customer vehicle concerns which would be used to improve their own processes." *Id.*

The thirty-seventh category is "Tesla's internal estimated failure and replacement forecast" for a particular component. *Id.* ¶ 55. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla monitors and assesses field incidents which would be used to improve their own processes." *Id.*

The thirty-eighth category is "the chronology of Tesla's internal investigation as well as findings and conclusions, safety assessment, failure analysis and root cause assessment." *Id.* ¶ 56. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into Tesla's internal investigative process which would be used to improve their own processes." *Id.*

The thirty-ninth category is material addressing "component supply concerns." *Id.* ¶ 58. Public disclosure thereof "would cause competitive harm to Tesla by giving Telsa's competitors insight into Tesla's business operations including details of relationships with suppliers and parts sourcing strategies which would be used to improve their own sourcing processes." *Id.*

The fortieth category is "changes to hardware, software and manufacturing." *Id.* ¶ 60. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors

insight into Tesla's supply, vehicle improvements, and manufacturing processes which would be used to improve their own vehicle design and manufacturing processes." *Id.*

The forty-first category is "service diagnostic tools, records, and documentation including screen shots of internal Tesla databases used by [Tesla's] field teams to diagnose and repair vehicles, and videos and photos taken inside customer vehicles for the purpose of documenting customer concerns, and diagnosing and remedying vehicles." *Id.* ¶ 61. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla's field teams assess, diagnose, and repair customer vehicle concerns which would be used to improve their own field operations." *Id.*

The forty-second category is "information available on Tesla's internal communication platform between the service and engineering departments." *Id.* ¶ 62. Public disclosure thereof "would cause competitive harm by giving Tesla's competitors insight into Tesla's internal platform as well as the content of technical information and communications about Tesla vehicles and features sent through the platform," and "[c]ompetitors would use this information to improve their own processes and strategies to communicate between the service and engineering departments as well as to improve their products." *Id.*

The forty-third category is "component architecture specifications." *Id.* ¶ 64. Public disclosure thereof "would cause competitive harm to Tesla by providing competitors with insight into details of Tesla's component architecture and design which they would use to improve their own component design." *Id.*

The forty-fourth category is "Tesla Service estimates." *Id.* ¶ 65. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla

Service evaluates, diagnoses and repairs vehicles," and "[t]his information would be used by competitors to improve their own service-related processes and customer service." *Id.*

The forty-fifth category is "vehicle system logs and kernel logs." *Id.* ¶ 66. Public disclosure thereof "would cause competitive harm to Tesla by giving Tesla's competitors insight into how Tesla's operating system functions, vehicle firmware and software versions, and how Tesla uses these logs to investigate field incidents which Tesla's competitors would use to improve their own operating systems and processes for investigating field incidents." *Id.*

The Agency did not accept Tesla's assertions uncritically. *See* Hendrickson Decl. ¶ 21 ("NHTSA has reviewed the declaration of Eddie Gates, in connection with its own independent review of the records at issue, and is independently satisfied that the records that NHTSA has withheld in full or in part are appropriately withheld under Exemption 4."). Indeed, the Agency explicitly denied Tesla's requests to keep confidential two types of materials—specifically, (1) "Event Data Recorder (EDR) reports," *id.* ¶ 17; *see also* NHTSA, *Event Data Recorder*, https://www.nhtsa.gov/research-data/event-data-recorder (last accessed Mar. 14, 2025) (explaining that EDR "refer[s] to a device installed in a motor vehicle to record technical vehicle and occupant information for a brief period of time (seconds, not minutes) before, during and after a crash"); and (2) a photo that was publicly available on at least one website, Hendrickson Decl. ¶ 17. The Agency disclosed these materials to Plaintiff. Hendrickson Decl. ¶ 19. The Agency has also updated its confidentiality determination regarding certain materials that have since lost their confidential status and has, accordingly, provided those to Plaintiff, as well. *Id.* ¶ 22.

Both Tesla and the Agency conducted a line-by-line review of all records at issue. *See, e.g.*, Gates Decl. ¶ 7 ("Tesla conducted a line-by-line review of the documents[.]"); Hendrickson Decl. ¶ 25 ("NHTSA performed a line-by-line review of the documents withheld in full or in

part[.]"); Humphrey Decl. ¶ 23 ("NHTSA conducted a line-by-line review of the documents[.]").

Both Tesla and the Agency confirmed that further segregation could not occur without causing

foreseeable harm.  *See, e.g.*, Gates Decl. ¶ 7 ("The documents [withheld in full] cannot be

segregated without revealing confidential business information that would cause commercial or

financial harm to Tesla."); Hendrickson Decl. ¶ 25 ("NHTSA performed a line-by-line review of

the documents withheld in full or in part and confirmed, as further described in NHTSA's *Vaughn*

index, that further segregation or disclosure of these records would cause foreseeable competitive

harm to Tesla and, because disclosure would impact the willingness of entities such as Tesla to

provide confidential information, foreseeable harm to NHTSA itself in obtaining information

necessary fulfill its core safety mission."); Humphrey Decl. ¶ 23 ("Any further segregation or

disclosure of the withheld materials is reasonably expected to cause the harms identified above.");

*see also, e.g.*, Defs.' Exemption 4 *Vaughn* Index (Ex. 1) at 1 ("NHTSA also considered whether

any further information within this record could be segregated and disclosed, but any further

disclosure will cause harm to Tesla and also to NHTSA as it endeavors to fulfill its important

mission of ensuring vehicle safety by continuing to receive confidential information from vehicle

manufacturers.").

     In communications between the parties, Plaintiff has previously taken issue with Tesla's

position here in light of a tweet sent months ago by Elon Musk—who is Tesla's co-founder and

CEO, *see* Tesla, *Elon Musk*, https://www.tesla.com/elon-musk (last accessed Mar. 14, 2025)—that

stated: "There should be no need for FOIA requests.  All government data should be default public

for maximum transparency."    @elonmusk, X (Nov. 3, 2024, 9:19 a.m.), Elon Musk,

https://x.com/elonmusk/status/1853079605596340235?lang=en.    Mr. Musk posted a clip of

himself saying: "I think that the strong bias with respect to government information should be to

make it available to the public.  Let's be as transparent as possible.  Fully transparent.  Unless it's a massive risk to the country – we don't want to give, say, exact instructions on how to make a nuclear bomb or something like that – but unless there's a genuine risk to the country, all information in the government should be public."  *Id.*; *see also* @ElonClipsX, X (Nov. 3, 2024, 9:06 a.m.), ELON CLIPS, https://x.com/ElonClipsX/status/1853076369271324866 (embedded video).  Mr. Musk's statements reflect "generic promises of transparency" in the abstract, but they do not change the governing law that is applicable to the specific documents at issue in this case. *See Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 71 F.4th 1051, 1056 (D.C. Cir. 2023). What matters for Exemption 4 is the Agency's independent determination, not Tesla's CEO's former statement from months before, and with Tesla continuing to assert Exemption 4 and providing adequately declaratory support to attest to the harm from further disclosure, the Agency's determination is amply supported by the record.  Defendants respectfully submit that they have appropriately invoked Exemption 4 to withhold the material in question.

## III.    THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 5 WITHHOLDINGS.

The Agency's Exemption 5 withholdings apply to a small subset of the records at issue, *compare* Hendrickson Decl. ¶ 14, *with* Humphrey Decl. ¶ 18, and fall into three categories: (1) deliberative process privilege; (2) attorney-client communications privilege; and (3) commercial confidential information privilege.  The Agency has adequately supported each of its withholdings.

### A.    The Agency Has Adequately Supported Its Deliberative Process Withholdings.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption shields documents of the type that would be privileged in the civil

discovery context, including materials protected by the deliberative-process privilege. *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *Rockwell Int'l Corp. v. Dep't of Just.*, 235 F.3d 598, 602 (D.C. Cir. 2001). The Agency's Exemption 5 withholdings, which cover only a small portion of the material withheld here (in 115 documents), primarily invoke the deliberative process privilege (in 111 documents). Humphrey Decl. ¶ 18; *see also* Hendrickson Decl. ¶ 14 (1,385 documents with Exemption 4 withholdings).

The deliberative process privilege protects intra- or inter-agency documents that are "both predecisional and deliberative." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021); *accord Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petrol. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992). "Material is deliberative if it 'reflects the give-and-take of the consultative process.'" *Id.* "Examples of predecisional documents include 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Cleveland v. United States*, 128 F. Supp. 3d 284, 298–99 (D.D.C. 2015) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

The deliberative process privilege protects "materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967)). This privilege rests "on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front

page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001); *accord Jud. Watch, Inc. v. Dep't of Just.*, 20 F.4th 49, 54 (D.C. Cir. 2021). The deliberative process privilege is designed to prevent injury to the quality of agency decisions by (1) encouraging open, frank discussions on matters of policy between subordinates and superiors; (2) protecting against premature disclosure of proposed policies before they are adopted; and (3) protecting against public confusion that might result from the disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's decision. *See Sears*, 421 U.S. at 151–53; *Coastal States*, 617 F.2d at 866; *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. Inc. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010). The "ultimate aim" of the deliberative process privilege set forth in Exemption 5 is to "prevent injury to the quality of agency decisions." *Petrol. Info.*, 976 F.2d at 1433–34 (internal quotation marks omitted). "There should be considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take—of the deliberative process—by which the decision itself is made'" because the agency is best situated "to know what confidentiality is needed 'to prevent injury to the quality of agency decisions.'" *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (quoting *Sears*, 421 U.S. at 151).

Here, the Agency has withheld material contained within 111 internal Agency documents under the deliberative process privilege, which are identified in the Humphrey Declaration and Defendants' Exemptions 5/6 *Vaughn* index (Ex. 2). *See* Humphrey Decl. ¶ 18. The withheld material "reflects the internal exchange of information, ideas, and recommendations that occurred relating to a potential investigation while NHTSA personnel were in the process of formulating

strategies and approaches towards next steps or options in connection with that potential investigation." *Id.* ¶ 19. "[T]he deliberative process was how to proceed with NHTSA's investigatory and enforcement activity concerning Tesla's vehicles." *Id.* ¶ 20. "The role the documents played is to impart information to other NHTSA staff that they would consider as they sought to pursue their investigatory and enforcement activity with respect to the investigations and inquiries into certain aspects of Tesla's vehicles." *Id.* "The withheld materials do not reflect a final decision." *Id.* "The sender of the document did not have final decisionmaking authority concerning the issue at question." *Id.*

Defendants have also confirmed that "[a]ny further segregation or disclosure of the withheld materials is reasonably expected to cause the harms" they have identified. *Id.* ¶ 23. "If [these] internal communications were disclosable, agency personnel would become hesitant to candidly discuss ideas or proposals for handling safety investigations." *Id.* ¶ 19. "Additionally, disclosure of this information would harm transparency as it would become more difficult for the agency to critically consider what types of information could be shared upon a public request." *Id.*

In light of the foregoing and Defendants' evidentiary support, Defendants' descriptions of these records demonstrate that their invocations of Exemption 5 are warranted. Accordingly, the Court should enter summary judgment in Defendants' favor.

### B.    The Agency Has Adequately Supported Its Attorney-Client Communications Withholdings.

The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). This privilege protects "communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'" *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997)

(quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).  Courts may infer confidentiality where communications suggest that "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests."  *Coastal States*, 617 F.2d at 863; *see also Tax Analysts*, 117 F.3d at 618 ("[T]he 'client' may be the agency and the attorney may be an agency lawyer.").

Here, the Agency redacted certain "communications and recommendations involv[ing] NHTSA counsel in the course of their agency role of providing legal advice to agency personnel or reviewing ongoing agency activities to determine where and when such advice may be necessary."  Humphrey Decl. ¶ 21.  These withholdings occur in fifty-nine documents and are also fully covered by the deliberative process privilege.  *Id.* ¶ 18.  "NHTSA has maintained the confidentiality of these communications and recommendations, which were in furtherance of NHTSA's investigatory and enforcement activity concerning Tesla's vehicles."  *Id.* ¶ 21.  "Many of these documents, as identified on NHTSA's *Vaughn* index, were sent by a NHTSA attorney." *Id.*; *see also* Defs.' Exemptions 5/6 *Vaughn* Index (Ex. 2) at 101.  "For the ones in which the sender was not an attorney, a recipient was a NHTSA attorney, and the NHTSA attorney or attorneys were included on the email for purposes of providing legal advice regarding NHTSA's investigatory and enforcement activity."  Humphrey Decl. ¶ 21; *see also* Defs.' Exemptions 5/6 *Vaughn* Index (Ex. 2) at 101.

"Disclosure of NHTSA attorneys providing legal advice or requests for NHTSA attorneys to provide legal advice, which is collectively the material identified in this paragraph, would cause foreseeable harm, as it would shake the foundation of the legal profession, with clients not feeling comfortable asking for advice and attorneys not feeling comfortable providing it."  Humphrey Decl. ¶ 21; *see also Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120

(D.D.C. 2021) ("Release of attorney-client communications would undoubtably undermine our legal culture. Agencies would lose an important tool in their decisionmaking process—employees' ability to confidentially consult agency lawyers."). "This would be particularly harmful within a government agency, such as NHTSA, which is frequently addressing issues touching on the law and, therefore, NHTSA staff need to be able to converse freely with NHTSA attorneys." Humphrey Decl. ¶ 21. "Any further segregation or disclosure of the withheld materials is reasonably expected to cause the harms identified above." *Id.* ¶ 23.

Defendants respectfully submit that they have demonstrated that their attorney-client privilege withholdings are appropriate and that they are entitled to summary judgment.

### C. The Agency Has Adequately Supported Its Confidential Commercial Information Withholdings.

In just four documents, the Agency has withheld "conference call numbers and passcodes" under the confidential commercial information privilege. Humphrey Decl. ¶¶ 18, 22. In *Federal Open Market Committee v. Merrill*, 443 U.S. 340 (1979), the Supreme Court held that Exemption 5 incorporates a qualified privilege for confidential commercial information generated in the process of awarding a contract. *Id.* at 360. The Supreme Court explained that "[t]he theory behind a privilege for confidential commercial information . . . is not that the flow of advice may be hampered, but that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered." *Id.* The D.C. Circuit has confirmed that Exemption 5 incorporates the confidential commercial information privilege. *Burka v. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 518 n.11 (D.C. Cir. 1996) ("In deciding that Exemption 5 included confidential commercial information which would be protected in discovery, the *Merrill* Court also relied on the oblique reference in a House Report to the need to withhold information generated in the process of awarding a contract.").

The basis for this privilege is Federal Rule of Civil Procedure 26. *See Merrill v. Fed. Open Mkt. Comm. of Fed. Rsrv. Sys.*, 516 F. Supp. 1028, 1030 (D.D.C. 1981) (noting the Supreme Court's "holding [in *Merrill*] that a privilege from disclosure, analogous to the qualified privilege for confidential commercial information available in civil discovery under Rule 26(c)(7) was available under Exemption 5" (citation omitted)).  Indeed, Federal Rule of Civil Procedure 26 permits the Court to enter a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).

Here, the only information that the Agency seeks to shield under the confidential commercial information privilege is its confidential conference call numbers and passcodes. Humphrey Decl. ¶ 22.  These conference call numbers and passcodes typically do not change for a particular user.  *Id.*  Public release of conference call numbers and passcodes would potentially allow uninvited third parties to illegally listen to confidential internal calls.  *Id.*; *see also id.* ¶ 23 (further attesting to the harm from any further disclosure).  There is no need for the disclosure of these numbers, which would not shed light on how the Agency conducts its business.  *See Jud. Watch, Inc. v. Reno*, Civ. A. No. 00-0723, 2001 WL 1902811, at *7 (D.D.C. Mar. 30, 2001) ("This court does not see, and plaintiff does not suggest, any way in which the release of those names and telephone numbers would shed light on the agency's performance of its duties.").  Thus, courts have not hesitated to conclude that these sorts of numbers are appropriately withheld under Exemption 5.  *See, e.g.*, *Menifee v. Dep't of Interior*, 931 F. Supp. 2d 149, 165 (D.D.C. 2013) (upholding Exemption 5 claim for "conference call numbers and passwords").  Accordingly, the Agency's four confidential commercial information withholdings are appropriate.

## IV.    THE AGENCY HAS ADEQUATELY SUPPORTED ITS EXEMPTION 6 WITHHOLDINGS.

FOIA Exemption 6 protects information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The term "similar files" is construed broadly, and it is "intended to cover detailed Government records on an individual which can be identified as applying to that individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). The threshold inquiry is minimal, such that "[a]ll information which applies to a particular individual is covered by Exemption 6, regardless of the type of file in which it is contained." *Concepcion v. FBI*, 606 F. Supp. 2d 14, 35 (D.D.C. 2009); *see also Wash. Post Co. v. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982) ("All information which 'applies to a particular individual' is covered by Exemption 6, regardless of the type of file in which it is contained." (quoting *Wash. Post*, 456 U.S. at 602)).

Here, the Agency has withheld "names of non-agency individuals, signatures, physical addresses, e-mail addresses, images of persons, phone numbers, driver's license numbers, and dates of birth." Humphrey Decl. ¶ 25. The Agency has likewise withheld information that would allow for the identification of those individuals—namely, "license plate numbers, location descriptions, tracking numbers, complaint numbers, serial numbers, claim numbers, court filing information, correspondence dates, appointment dates, and financial transaction information." *Id.* ¶ 26. Similarly, the Agency has withheld vehicle identification numbers or VINs, which "can easily be used to identify the name, address, date of birth, and lien information of a vehicle owner." *Id.* ¶ 27. Lastly, the Agency withheld crash incident dates, location descriptions, and descriptions of physical or mental effects of a crash incident. *Id.* ¶ 28. Often, the isolated material protected by Exemption 6 appears in documents withheld in full under FOIA Exemption 4, but the Agency

37

did not withhold any documents in full under Exemption 6. *See id.* ¶ 24; *compare, e.g.*, Exemptions 5/6 *Vaughn* Index (Ex. 2) at 6 (referring to NHTSA-ES21-000180- 500 Partial Response II), *with* Exemption 4 *Vaughn* Index (Ex. 1) at 1 (same document).

All of this information "applies to a particular individual" and thus satisfies Exemption 6's threshold analysis. *Wash. Post*, 690 F.2d at 260. The Agency has balanced the public interest—to the extent any exists, *see* Humphrey Decl. ¶ 29 ("There is, for instance, no benefit to the public knowing the specific identities of these drivers of Tesla vehicles.")—and the privacy interests of these private citizens whose information is swept up in the Agency's records, *id.* An "individual's interest in maintaining privacy outweighs the public interest in identifying individuals who have experienced issues with their vehicles." *Id.*; *see also Ctr. for Auto Safety v. NHTSA*, 809 F. Supp. 148, 150 (D.D.C. 1993). Disclosure risks "subjecting the individuals to unwanted intrusion into their experiences and solicitation, harassment, and contact by the media, attorneys, and other interested parties." Humphrey Decl. ¶ 29. Disclosure "would foreseeably harm the individual's substantial privacy interest and constitute an invasion of privacy by allowing others to obtain and exploit [personally identifiable information] for commercial or private gain." *Id.* "Any further segregation or disclosure of the material withheld under Exemption 6 is reasonably expected to foreseeably harm the substantial privacy interest of the individuals at issue, and the balancing analysis that NHTSA has conducted tilts firmly in favor of nondisclosure." *Id.* Accordingly, Defendants have demonstrated that their Exemption 6 withholdings are appropriate, and the Court should grant summary judgment in their favor.

## CONCLUSION

For the reasons discussed above, the Agency properly invoked FOIA Exemptions 4, 5, and 6. Defendants respectfully request that the Court grant their motion for summary judgment.

Dated: March 14, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney


By:    _____/s/ *Douglas C. Dreier*_____
       DOUGLAS C. DREIER, D.C. Bar #1020234
       Assistant United States Attorney
       601 D Street, NW
       Washington, DC 20530
       (202) 252-2551

       *Attorneys for the United States of America*

39